# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

| | | |
|---|---|---|
| RANDAL J. CHATHAM, | :: | CIVIL ACTION NO. |
| Inmate # GDC 255030, | :: | 3:05-CV-0127-JTC |
|     Plaintiff, | :: | |
| | :: | |
|     v. | :: | |
| | :: | |
| COL. BLAKE ADCOCK, | :: | PRISONER CIVIL RIGHTS |
| SGT. ELIZABETH HOMER, | :: | 42 U.S.C. § 1983 |
| NURSE JENNIE ADCOCK, | :: | |
|     Defendants. | :: | |

## ORDER AND OPINION

Now before the Court are (1) Defendants' Motion for Summary Judgment, with supporting brief and affidavits [Docs. 26, 29, 30, 63]; Plaintiff's Response [Docs. 41-42]; Defendants' Reply [Docs. 43-44]; and Plaintiff's Rebuttal [Docs. 45-46]; (2) Plaintiff's Motion to Compel [Doc. 47] and Defendants' Response [Doc. 50]; (3) Plaintiff's Second Motion to Compel Discovery [Doc. 59], Defendants' Response [Doc. 61], and Plaintiff's Reply [Doc. 62]; (4) Plaintiff's Second Motion for Rule 56(f) Continuance [Doc. 56]; (5) Plaintiff's motions for Extension of Time [Doc. 52] and for Reconsideration [Doc. 53] of this Court's Order denying his motions to amend his complaint and to dismiss Defendants' summary judgment motion; and (6) Plaintiff's Motion for Appointment of Counsel [Doc. 49].

## I.  BACKGROUND AND PRELIMINARY MATTERS

In his complaint, as amended, Plaintiff seeks seven and one-half million dollars in compensatory, punitive, and nominal damages[1] from the remaining three Defendants,[2] based on their treatment of him during his incarceration at the Coweta County Jail (the Jail) from January 26, 2005, through July 19, 2005.  Plaintiff sues (1) Col. Adcock "for his initiation and enforcement of policies" that (a) denied Plaintiff a transfer away from a fellow inmate, Jason Hardy, who assaulted Plaintiff on July 12, 2005, and (b) twice prevented Plaintiff from receiving his prescribed medications, "causing undue pain and suffering"; (2) Sgt. Homer for refusing to move Plaintiff away from Hardy; and (3) Nurse Adcock for twice denying his prescribed medications, Xanax and Vicodin, and for denying adequate treatment for his cysts. [See generally Docs. 1, 8-2, 9; Doc. 8-2 at 17-20.]  Having amended his complaint once, without leave of court, Plaintiff sought leave to do so again, to add a defendant,

_____

[1]  Plaintiff also seeks injunctive relief.  However, because he is no longer incarcerated at the Coweta County Jail, he may not obtain such relief from Defendants.  See McKinnon v. Talladega County, 745 F.2d 1360, 1363 (11th Cir. 1984) (stating "general rule" that "a prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief").

[2]  The Court previously dismissed a fourth Defendant, Sgt. John Lewis, because Plaintiff failed to state a claim for relief against him.  [See Doc. 9 at 12-13.]

Dr. Burnett, and to add claims regarding violations that allegedly occurred in August and November 2004.  [Doc. 34.]  The Court denied that motion.  [Doc. 48.]

Plaintiff also previously filed, on November 1, 2006, a Motion for Rule 56(c) Dismissal of Defendants' Motion for Summary Judgment because he had yet to be served with a copy of the summary judgment motion.  [Doc. 33.]  Because subsequent proceedings – most notably, Plaintiff's multiple responses to Defendants' motion for summary judgment, which Plaintiff began filing on November 27, 2006 – revealed that Defendants had served Plaintiff with their summary judgment motion, the Court denied Plaintiff's Rule 56(c) motion for dismissal.  [Doc. 48.]  In addition, Plaintiff previously filed a Motion for Rule 56(f) Continuance, seeking additional time to respond to Defendants' summary judgment motion and additional time for discovery. [Doc. 32.]  Because, in the meantime, Plaintiff had responded to the summary judgment motion, the Court granted Plaintiff's motion in part, *nunc pro tunc*, deeming Plaintiff's response to be timely filed, but denied his motion for an extension of the discovery period.  [Doc. 48.]

3

**A.**    **Plaintiff's motion for reconsideration of Order denying motions for leave to amend complaint and to dismiss Defendants' summary judgment motion, and Plaintiff's motion for time to file motion for reconsideration**

Previously, this Court denied Plaintiff's motion for leave to amend his complaint a second time in part because he "filed his original complaint on November 22, 2005, [when] all of the alleged events underlying his proposed amendments were known to him, but he failed to mention them," and he again failed to mention them when he filed his first amended complaint on January 17, 2006.  [Doc. 48 at 4.] Moreover, "Plaintiff filed his proposed second amended complaint on November 8, 2006, almost a year after he filed his original complaint."  [Id.]

In his motion for reconsideration, Plaintiff asserts that, due to Defendants' stonewalling of his discovery requests, he "could not have realized the need for, nor had the evidence needed for the filing of his second amended complaint at the time" he filed his first amended complaint because "the documents which facilitated [his] Second Amended Complaint were not coaxed from Defendants' possession . . . until after May 3, 2006."  [Doc. 53 at 2.]  Plaintiff also asserts that, at the time he filed his proposed second amended complaint, Defendants had not served their summary judgment motion upon him, so that his motion for leave to amend did "not come after full discovery nor beyond the deadline for amendments and dispositive motions."  [Id.

4

at 14.] Plaintiff also asks this Court to reconsider its denial of his motion to dismiss Defendants' motion for summary judgment due to their failure to serve that motion upon him at his address of record, which "unfairly jeopardized the prosecution of this case and caused undue burden on Plaintiff in his last minute construction and filing of motions in an attempt to counter Defendants' strategy in the mysterious misservice." [Id.]

It seems unlikely that it was only after Plaintiff perused discovery documents in May 2006 that he first became aware of Defendants' alleged mistreatment of him in August and November 2004 – mistreatment which, according to his proposed second amended complaint, caused him "extreme anxiety" and "horribly torturous nightmares," and about which he allegedly complained to an emergency room physician in November 2004. [See Doc. 38.] Moreover, by November 2006, when Plaintiff filed his proposed second amended complaint, the two-year statute of limitations had expired on his claims arising from events in August 2004. See Thigpen v. Bibb County, 223 F.3d 1231, 1243 (11th Cir. 2000). Furthermore, regardless of precisely when Defendants served their summary judgment motion on Plaintiff, he was given time to respond to that motion, and he did respond (and rather copiously, it seems). Accordingly, although Plaintiff's Motion for Extension of Time

5

to file the instant Motion for Reconsideration is granted, the Motion for Reconsideration itself is denied.

**B.  Plaintiff's motions to compel and for Rule 56(f) continuance**

### 1.  Plaintiff's document requests

On August 15, 2006, Plaintiff served Defendants with his First Request for Production of Documents, seeking the following documents: (1) the policies and procedures for classifying prisoners as "violent offenders" or "general population" at the Jail; (2) the Jail's policies and procedures regarding "doctor prescribed medications and adhering to plan of treatment"; (3) disciplinary records and incident reports for Randal Jeffery Chatham (Plaintiff's son), James Randal Chatham (Plaintiff), and Jason Kenyatta Hardy (the inmate who assaulted Plaintiff on July 12, 2005); (4) Hardy's mental health records; (5) the Jail's "policies on staff responses to inmate-on-inmate threats and violence"; (6) documents regarding the "high security measures employed" to transport Hardy from the Jail to state prison; (7) a list of all grievances filed at the Jail during 2003-05; (8) a list of all grievances appealed from the Jail to the Georgia Department of Corrections (GDOC) during 2003-05; (9) a list of medical personnel employed at the Jail in 2005; (10) information about the officer who authorized Plaintiff's transfer to the Jail's A-6 maximum security

6

dormitory in February 2005; (11) information about a prisoner with a gunshot wound in his hand who was housed in the Jail's A2 dormitory in July 2005; (12) incident reports, audio and video tapes, statements, and other investigative materials, among other documents, regarding Hardy's assault on Plaintiff; (13) all incident reports of "inmate-on-inmate assault" at the Jail during 2003-05; (14) all other relevant documents, including sworn and unsworn statements or affidavits; and (15) all documents regarding "any insurance agreement or arrangement" with respect to this litigation.  [Doc. 47, Ex. 6.]  In his Motion to Compel, Plaintiff limits Document Request No. 3 to incident reports regarding Hardy only.  [Doc. 47 at 4.]

> ## 2.    Defendants' responses to Plaintiff's document requests

On September 21, 2006, Defendants served Plaintiff with their responses to his document requests.  Defendants (1) provided the classification forms used to aid in Plaintiff's and Hardy's dormitory assignments, noting that Hardy had been incarcerated for aggravated assault on April 5, 2005; (2) provided the Jail's policy regarding "prescriptions for controlled substances," "med call," and "administration of psychiatric medications"; (3) provided Plaintiff's own incident reports from 2004-05, but declined to provide those for Hardy; (4) declined to provide Hardy's health records, citing, *inter alia,* the prohibitions contained in the Health Insurance

7

Portability and Accountability Act (HIPPA); (5) provided the Jail's Standard Operating Disciplinary Procedures; (6) declined to provide documents regarding Hardy's transport to state prison as irrelevant; (7)-(9) declined to provide lists of grievances, grievance appeals, and medical personnel employed at the Jail in 2005, as overly broad, unduly burdensome, and irrelevant, and noted that the Jail does not maintain a list of medical personnel employed during any given year; (10)-(11) declined to provide information about the officer who transferred Plaintiff to maximum security or the inmate with the gunshot wound because the requests were for information, not existing documents, and were irrelevant; (12) provided "all documents" in their possession relating to Hardy's assault on Plaintiff; (13) declined to provide incident reports regarding inmate on inmate assaults as being, *inter alia,* unduly burdensome, overly broad, and irrelevant; (14) provided "all other documents in their possession related to the incident on July 12, 2005," and noted that all documents related to Plaintiff's health-care claims were included with their Motion for Summary Judgment; and (15) declined to provide the requested insurance agreement as irrelevant. [Doc. 47, Ex. 7.] It appears that Plaintiff received a copy of these responses on or about November 6, 2006. [See id. at 1 (Washington State Prison Mailroom date-stamp).]

8

### 3.     Plaintiff's first motion to compel

In Plaintiff's first motion to compel, which he served on January 16, 2007, he notes Defendants' history of responding only reluctantly to his discovery requests, [Doc. 47 at 1] and states that Defendants have "failed to produce the documents requested," including, *inter alia*, the Jail's Standard Operating Procedures regarding prisoner classification [id. at 2]; the Jail's policy regarding "adherence to plans of treatment and medications prescribed by outside physicians" [id. at 3]; the Jail's policy regarding the procedure "officers are to follow in a situation of [im]minent danger to an inmate from another inmate" [id. at 6]; the "grievance log" that Georgia jails are required to maintain [id. at 7-8]; the name of a "Jane Doe" nurse who "is a key witness in this case" and whose "testimony is essential in presenting the facts" regarding the denial of medications at the Jail [id. at 9]; the "authorization document," revealing the name of the officer who upgraded Plaintiff ("a non-violently prone, non-escape prone inmate") to a maximum security dormitory [id. at 10]; the name of a "John Doe" inmate, easily identifiable by medical records documenting the treatment of a gunshot wound to his hand, who is "a key witness to the fact that [the Jail] does not allow 'controlled substances' (narcotic pain relievers), no matter how horribly an inmate may be injured and suffering" [id. at 11]; and "investigative

9

materials" concerning Hardy's assault on Plaintiff, such as an audiotaped statement Plaintiff gave to Sgt. Joe Ables, and the sergeant's subsequent report [id. at 12, 14].

### 4.   Defendants' response to Plaintiff's first motion to compel

In response to Plaintiff's first motion to compel, Defendants assert that Plaintiff has not complied with the Federal Rules of Civil Procedure or this Court's Local Rules because he "has not shown he contacted defense counsel or made any effort to resolve this discovery dispute" before filing his motion to compel. [Doc. 50 at 3-4.] Defendants note that Plaintiff "filed" his document requests on August 15, 2006; that "discovery would have closed on September 18, 2006" (five months after Defendants answered Plaintiff's complaint on April 18, 2006); and that Plaintiff received Defendants' response to his document requests on or about November 2, 2006. [Id. at 1.] Defendants argue, therefore, that Plaintiff's motion to compel, which he served on January 16, 2007, is untimely, because Local Rule 37.1(B) of this Court requires that such a motion be filed before "the close of discovery, within ten days after service of the discovery response" at issue. [Id. at 7.]

With respect to Plaintiff's specific document requests, Defendants note that they have provided Plaintiff with his own January 26, 2005, classification form at the Jail [id. at 9 & Attach. 2], and the Jail's policy on controlled substances for inmates

10

[id. at 9-10; see Doc. 30, Attach. B].  Defendants assert that they were not aware of an audiotaped interview conducted by Sgt. Ables in connection with the criminal investigation of Hardy's assault on Plaintiff, and, in any case, because they do not deny that Hardy assaulted Plaintiff and "was responsible for [his] injuries," that audiotape is irrelevant.  [Doc. 50 at 13-14.]  Defendants reiterate their objections to Plaintiff's remaining document requests as irrelevant, overbroad, overly burdensome, and/or seeking information protected from disclosure or not previously reduced to documentary form.  [Id. at 7-15.]

> **5.    Plaintiff's second motion to compel, Defendants' response, and Plaintiff's reply**

On January 31, 2007, Plaintiff served on Defendants his First Interrogatories. [Doc. 51.]  On May 1, 2007, Plaintiff served on Defendants a Request for Response to Plaintiff's Interrogatories & Production of Documents.  [Doc. 57.]  On June 8, 2007, Plaintiff filed his second motion to compel discovery, seeking responses to his unanswered interrogatories and also seeking supplemental responses to his document requests.  [Doc. 59 at 1-2.]

Defendants respond by noting that, inasmuch as the discovery period in this case closed in September 2006, pursuant to Local Rule and this Court's Order [Doc.

48], they declined to respond to Plaintiff's interrogatories or his followup request for responses. [Doc. 61 at 2, 3-4.] Defendants argue that Plaintiff served these discovery requests approximately five and eight months, respectively, after the discovery period closed, so that they do not warrant a response. Defendants also argue that Plaintiff's second motion to compel discovery, like his first, fails because he has not certified that he made a good-faith attempt to confer with them or their attorney before seeking court intervention. [Id. at 4-7.]

Plaintiff replies that his May 1, 2007, letter to Defendants' attorney constitutes his good-faith effort to confer regarding the discovery requests at issue. [Doc. 62 at 2, 4 & Ex. MC7 (Plaintiff's letter reads as follows: "Plaintiff requests defendants respond to interrogatories mailed to your office on January 31, 2007 and also that defendants satisfy Plaintiff's request for production of documents.").] Plaintiff argues that Defendants cannot be allowed to run the discovery clock by stonewalling his multiple attempts to obtain discovery responses; swamp him with "useless paperwork" at the eleventh hour; and then hide behind the expiration of the discovery clock as a shield against performing their duties under the Federal Rules of Civil Procedure. [Id. at 2-4.]

12

**6.**     **Plaintiff's second motion for a Rule 56(f) continuance**

In his second motion for a Rule 56(f) continuance, Plaintiff chronicles the following discovery history in this case: (1) Defendants denied Plaintiff's first discovery attempt, propounded through the Freedom of Information Act on January 3, 2006; (2) Defendants also denied Plaintiff's second and third discovery attempts, propounded through the Georgia Open Records Act in January and March 2006; (3) Plaintiff received the aid of the Georgia Attorney General's Office on May 3, 2006, in retrieving a portion of his requested documents; (4) although lacking knowledge about the timing of the discovery period in this case, Plaintiff submitted his first set of document requests to Defendants on August 15, 2006; and (5) eighty-four days later, on November 7, 2006, Plaintiff received Defendants' responses, which included "volumes" of unrequested and worthless documents. [Doc. 56 at 1-3 & Exs. E1-E6.]

Plaintiff claims that Defendants continue to withhold crucial information from him.  He lists almost two dozen discovery requests to which he has not received an adequate response, and asserts that "through their denials and stall tactics [Defendants] have clearly shown they have never had any intention of releasing any documents or information valuable to the prosecution of this case."  [Id. at 4.]

13

Plaintiff states that Defendants have taken advantage of "this untrained and inexperienced prison *pro se* litigant," and claims that, in light of this Court's twice denying his motions for appointment of counsel, a Rule 56(f) continuance "would further justice" by protecting his rights against the "legal tricks of a trained legal firm employed by Defendants." [Id. at 5.]

### 7.   <u>Discussion</u>

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).  Furthermore, any party to a civil action "may apply for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a).  "The motion must include a certification that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action."  Fed. R. Civ. P. 37(a)(2)(A).  In this Court, a motion to compel discovery must be filed no later than the close of the discovery period or within ten days after service of the discovery response to which objection is made, if the response was served after the close of discovery.  N.D. Ga., L.R. 37.1.B.  "[A] district court is allowed a range of choice"

14

in deciding whether to grant or deny a motion to compel discovery responses, and that decision will be reversed only for an abuse of discretion.  <u>Holloman v. Mail-Well Corp.</u>, 443 F.3d 832, 837 (11th Cir. 2006) (internal quotations omitted).

On April 20, 2006, Defendants filed their answer to Plaintiff's complaint.  With a four-month discovery track, discovery closed on September 20, 2006.[3]  Defendants served their responses to Plaintiff's document requests on September 21, 2006, although Plaintiff did not receive them until the first week in November.  Thereafter, Plaintiff waited until January 16, 2007, before executing his first motion to compel, more than two months after receiving Defendants' responses and almost four months after discovery had closed.  Plaintiff apparently made no attempt to confer with Defendants to resolve his dissatisfaction with their responses to his document requests before filing his first motion to compel.

---

[3] In this Court, the discovery period begins thirty days "after the appearance of the first defendant by answer to the complaint."  N.D. Ga., L.R. 26.2.A.  There are three discovery tracks for civil litigation: (1) a zero-month track, which applies to prisoner civil-rights complaints; (2) a four-month track, which applies, *inter alia,* to other civil-rights cases; and (3) an eight-month track, which applies only to complex litigation involving patent rights, antitrust, and securities.  <u>Id.</u>; N.D. Ga., L.R., Appendix F.  A motion for an extension of the discovery period must be filed before the period closes.  N.D. Ga., L.R. 26.2.B.  As noted *supra*, this Court previously denied Plaintiff's motion for an extension of the discovery period, which Plaintiff executed on October 29, 2006, more than one month after the close of discovery. [Docs. 32, 48.]

On January 31, 2007, Plaintiff served interrogatories on Defendants, more than four months after the close of discovery.  On May 1, 2007, three months later, Plaintiff sent Defendants a two-sentence letter requesting, in general terms, that they respond to his discovery requests [see Doc. 62, Ex. MC7], which appears to be Plaintiff's only attempt to comply with his Fed. R. Civ. P. 37(a)(2)(A) obligation to confer in good faith with Defendants regarding their discovery disputes.[4]  In sum, it does not appear from the record that Plaintiff conferred in good faith with Defendants to resolve his discovery disputes with them or that he filed either of his motions to compel discovery within the time limits established by this Court's Local Rule 37.1.B.  Moreover, because Plaintiff has failed to state a constitutional claim against any Defendant, as discussed *infra*, the foregoing motions are moot.  Accordingly, Plaintiff's motions to compel discovery responses and for a Rule 56(f) continuance are denied.

---

[4] The Court is mindful of Plaintiff's various efforts to obtain documents from Defendants outside of the formal discovery process provided by the Federal Rules of Civil Procedure, but, unfortunately for Plaintiff, those efforts have no bearing on the resolution of the discovery disputes herein, which are strictly governed by the aforementioned rules.

16

### C.   Plaintiff's motion for appointment of counsel

Plaintiff once again moves this Court to appoint counsel to represent him, citing the foregoing discovery problems, Defendants' refusal to identify three crucial witnesses in this case, the complexity of the issues involved, and his inability, from his prison cell, "to locate and interview witnesses or to complete discovery" due to Defendants' continued intransigence.   [Doc. 49.]   Because, as discussed *infra*, Defendants' motion for summary judgment will be granted on all of Plaintiff's claims, his motion for appointment of counsel is denied as moot.

## II.  SUMMARY JUDGMENT STANDARD AND PROCEDURE

Summary judgment is proper if the pleadings and other documents on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When considering a summary judgment motion, a court must "view the evidence and all factual inferences therefrom in the light most favorable" to the non-movant.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187

17

(11th Cir. 1999).  "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible."  Cuesta v. School Bd. of Miami-Dade County, 285 F.3d 962, 970 (11th Cir. 2002) (internal quotations omitted).  Morever, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

The movant bears the initial burden of demonstrating that summary judgment is warranted.  Apcoa, Inc. v. Fidelity Nat'l Bank, 906 F.2d 610, 611 (11th Cir. 1990). The movant may do so by showing "that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.  Once the movant has properly supported the summary judgment motion, the non-movant then must "come forward with specific facts showing that there is a *genuine issue for trial*," i.e., that the evidence is sufficient to support a jury verdict in the non-movant's favor.

18

Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (internal quotations omitted).  See also Chanel, Inc. v. Italian Activewear of Florida, Inc., 931 F.2d 1472, 1477 (11th Cir. 1991) (stating that "non-moving party must come forward with *significant, probative evidence*") (emphasis added).  "[C]onclusory assertions . . . [without] supporting evidence are insufficient to withstand summary judgment." Holifield v. Reno, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997).

Nevertheless, "courts have been reluctant to apply" to *pro se* prisoners the Rule 56(e) requirement that a non-movant "cannot rely on his pleadings, but must file a response that includes other evidence."  Lawrence v. Wiley, Civil Action No. 1:03-CV-2970-RWS, 2006 U.S. Dist. LEXIS 4917, at *15-*16 (N.D. Ga. Jan. 24, 2006).  See also Gonzalez v. Long, 889 F. Supp. 639, 642 (E.D.N.Y. 1995) (allowing *pro se* prisoner additional time to respond to summary judgment motion, "mindful that *pro se* litigants should be given special latitude" in doing so, but noting that "abject failure to comply with the requirements of Rule 56(e) and [the court's local rule] would normally require the Court to grant" summary judgment motion).

A motion for summary judgment may be supported or opposed with "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any."  Fed. R. Civ. P. 56(c).  "As a general rule, the court may

consider on a Rule 56 summary judgment motion any material that would be admissible or usable at trial." Property Mgmt. & Inv., Inc. v. Lewis, 752 F.2d 599, 604 n.4 (11th Cir. 1985) (assuming without deciding "that authenticity and completeness are among the evidentiary requirements of Rule 56"). See also Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005) (stating that court "may consider only . . . evidence [that] can be reduced to an admissible form," and noting that "evidence that is otherwise admissible may be accepted in an inadmissible form at [the] summary judgment stage," and that, although hearsay generally cannot "be reduced to admissible form," statement of party's agent or servant may be admissible under Fed. R. Evid. 801(d)(2)(D) as admission of party-opponent); Woods v. City of Chicago, 234 F.3d 979, 987-88 (7th Cir. 2000) (stating that Rule 56(e) "does not *require* that all supporting material be submitted in affidavit form,"[5] and stating further that "court may consider any material that would be admissible or usable at trial, including properly authenticated and admissible documents or exhibits") (citation and internal quotations omitted).

---

[5] An affidavit "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence," and may be supported by "[s]worn or certified copies" of documents referred to in the affidavit. Fed. R. Civ. P. 56(e).

### III.  THE PARTIES' FACTUAL DISPUTES

**A.**      **Treatment of Plaintiff upon his arrival at the Jail in January 2005**

     **1.**      **Defendants' recitation of the facts**

Plaintiff was incarcerated at Coweta County Jail between January 26, 2005, and July 20, 2005.  [Doc. 26, Defs.' Statement of Material Facts not in Dispute (hereinafter Defs.' Undisputed Facts) ¶ 1.]  After violating his bond on an aggravated stalking charge, Plaintiff arrived at the Jail from West Central Georgia Regional Hospital, where he had spent three days recovering from an overdose of Xanax. [Defs.' Undisputed Facts ¶ 3; Doc. 63, Aff. of Blake Adcock (hereinafter Col. Adcock Aff.) ¶ 4; Doc. 30, Aff. of Jennie Adcock (hereinafter Nurse Adcock Aff.) ¶ 4; see also Doc. 26, Br. in Supp. of Defs.' Mot. for Summ. J. (hereinafter Defs.' Supp. Br.) at 1.]  When admitted to the Jail, Plaintiff had a prescription for Xanax. [Defs.' Supp. Br. at 3 (*citing* Pf.'s Complaint).]

During his first five days at the Jail, Plaintiff was placed on suicide watch in the booking area, to allow for easier observation, and received "medications for his mental illness," but not Xanax.  [Defs.' Undisputed Facts ¶ 4; Nurse Adcock Aff. ¶ 4.]  Nurse Adcock did not treat Plaintiff while he was on suicide watch and did not refuse to give him Xanax.  Plaintiff never asked her for Xanax, and she "never had

AO 72A
(Rev.8/82)

the opportunity to give . . . or deny him . . . the drug." Plaintiff's only request for medical services during those first five days was "a complaint of cold symptoms" submitted on January 29, 2005, although he did report to Nurse David Still that same day "that he was agitated due to not receiving Xanax." The staff psychiatrist interviewed Plaintiff on February 1, 2005. [Defs.' Undisputed Facts ¶ 5; Nurse Adcock Aff. ¶¶ 4, 5 & Attach. A.]

Inmates at the Jail normally are not allowed controlled substances, such as Xanax, which are dispensed "at the sole discretion of the facility medical director." [Defs.' Undisputed Facts ¶¶ 6, 26; Nurse Adcock Aff. ¶ 5 & Attach. B (Medical Department Policy/Procedure: "Controlled substances are only administered in the [Jail] under very limited circumstances on the order of the facility Medical Director. . . . Appropriate substitutions for prescriptions for controlled substances presented by the patient will be made at the discretion/orders of the facility Medical Director. . . . Approval of any controlled substance is on a case by case basis and at the sole discretion of the facility Medical Director.").]

Although the Jail has a grievance policy, "Plaintiff did not file a grievance "regarding any of the issues about which he sues." Had Plaintiff filed a grievance and received no response, he could have complained to the appropriate Jail officer.

22

Letters from inmates and concerned persons such as family members are accepted, but they are not treated as grievances and are not given a formal response.  [Defs.' Undisputed Facts ¶¶ 21-24; Doc. 29, Aff. of Woody Thompson (hereinafter Thompson Aff.) ¶¶ 4-7 & Attach. A at 5 (Coweta County Jail Inmate Rules, stating, in relevant part, the Jail's grievance policy under the heading <u>Inmate Grievance</u>: "Grievances will be in writing addressed to the attention of the Sergeant.  The Sergeant will review the complaint and forward it on to the Lieutenant for review.").]

### 2.    **Plaintiff's response**

Of Defendants' twenty-six allegedly undisputed material facts, Plaintiff disputes all but four.  [<u>Compare</u> Defs.' Undisputed Facts <u>with</u> Doc. 41, Pf.'s Dispute of Defs.' Undisputed Facts (hereinafter Pf.'s Dispute).  <u>See also</u> Doc. 44, Defs.' Reply to Pf.'s Dispute; Doc. 46, Pf.'s Re-Dispute of Defs.' Undisputed Facts (hereinafter Pf.'s Re-Dispute); Doc. 41, Aff. of Randal Chatham (hereinafter Pf.'s Aff.); Doc. 41, Exs. E1-E64 (hereinafter Pl.'s Exs).]  Plaintiff notes that he was incarcerated at the Jail not only on January 26, 2005, but also on August 23, 2004, and November 4, 2004.[6]  [Pf.'s Dispute ¶ 1.]  Plaintiff acknowledges that he was

---

[6] As noted *supra*, however, the Court has denied Plaintiff's motion to amend his complaint to add allegations regarding these earlier periods of incarceration.

brought to the Jail in January 2005 after spending three days in a state psychiatric unit "following a suicide attempt," and then spent the next five days on suicide watch, but claims that he was arrested for burglary, not on a bond violation.  [Id. ¶¶ 3, 4.]

Plaintiff asserts that Defendants have a policy and practice of using part-time doctors to insure that Jail inmates never receive doctor-prescribed "controlled substances"; that "their part-time jail physician, Dr. Burnett, has been instructed not to prescribe" controlled substances; and that Nurse Adcock "refused to give [him] his Xanax medication beginning August 23, 200[4]."  [Id. ¶¶ 5-6, 17.]  Plaintiff states that he entered Coweta County Jail in January 2005 with a Xanax prescription and a "plan of treatment" from a state-certified psychiatric unit, but Defendants ignored the plan and denied him his psychotropic medication.  [Doc. 41, Pf.'s Br. in Resp. to Defs.' Mot. for Summ. J. (hereinafter Pf.'s Resp.) at 4.]  Plaintiff contends that Nurse Adcock "dictates her own 'plan of treatment' to part-time jail physician, Dr. Burnett, then signs [the doctor's] name."  [Id.]

Plaintiff claims that the Jail's "grievance procedure exists only in theory and inmates are often/usually denied grievance forms."  [Pf.'s Dispute ¶ 21.]  Plaintiff asserts that he was "repeatedly denied" grievance forms by Jail officers.  [Pf.'s Resp. at 4; see Pf.'s Aff. ¶¶ 7, 8, 23, 24 (detailing efforts to grieve denial of Xanax).]

24

**B.**     **Treatment of Plaintiff's cysts**

    **1.**     **Defendants' recitation of the facts**

Defendants assert that Nurse Adcock treated Plaintiff for cysts in March and July 2005.  [Defs.' Undisputed Facts ¶ 7.]  On March 2, 2005, Plaintiff complained to Nurse Adcock about a cyst on his wrist.  Nurse Adcock told Plaintiff that Jail medical personnel do not normally treat this type of condition, but agreed to schedule an appointment with Dr. Burnett, who treated Plaintiff's cyst on March 8, 2005.  [Id. ¶ 8; Nurse Adcock Aff. ¶ 6 & Attachs. C, D.]  Later, on July 11, 2005, Plaintiff complained of "2 c[y]sts causing pain," located on his back.  On July 12, 2005, when Plaintiff "was brought in for injuries received from a fight," Nurse Adcock diagnosed his condition as an abscess, not a cyst, and, with Dr. Burnett's approval, started Plaintiff on the Jail's abscess protocol, which included antibacterial soap and Silva dressings to fight the infection.  [Defs.' Undisputed Facts ¶¶ 9-10; Nurse Adcock Aff. ¶ 7 & Attachs. E, F, H.]  Plaintiff did not file a grievance regarding the medical treatment for his cysts.  [See Defs.' Supp. Br. at 4.]

    **2.**     **Plaintiff's response**

Plaintiff claims that Nurse Adcock "did nothing to treat [his cysts] other than charging multiple co-pays and plagiarizing an E.R. physician's treatment," and that

he "demanded to see a physician." [Pf.'s Dispute ¶¶ 7-10.] Plaintiff contends that, in March 2005, Nurse Adcock "relayed her proposal concerning [his] treatment to Dr. Burnett," which "amounted to no more than her saying, 'We don't treat those'" cysts. [Pf.'s Resp. at 5.] Nurse Adcock's treatment plan, which amounted to "no treatment at all," "facilitated" the abscess and infection on Plaintiff's back. [Id.] Plaintiff notes that the E.R. physician who treated him after the July 12, 2005, assault prescribed "Silva dressings (large bandaids) and soap" for the laceration to Plaintiff's head, which treatment Nurse Adcock "plagiarized" for Plaintiff's cysts. Plaintiff asserts, however, that that care was inadequate, and his cysts abscessed, resulting in a "painful [staph] infection" that required more than eight weeks of treatment with antibiotics by GDOC doctors. [Id. at 7.] Plaintiff again states that he was denied grievance forms "repeatedly through his incarceration." [Id. at 5.]

**C.    Treatment of Plaintiff's injuries in July 2005**

    **1.    Defendants' recitation of the facts**

Immediately after Plaintiff was injured by Hardy, Nurse Adcock administered a tetanus shot and Plaintiff was taken to the emergency room at Newnan Hospital. Upon his return to the Jail, Plaintiff had "a prescription for Vicodin [7.5 mg] . . . for pain relief and Biaxin, an antibiotic, to treat the lacerations on his head" and the

injury to his ear.  Because Vicodin is a controlled substance, Nurse Adcock contacted

Dr. Burnett, and, based on their conversation, substituted Motrin, 800 mg twice daily,

for the Vicodin.   Plaintiff received this prescription, as ordered, until he was

transported to state prison on July 19, 2005.  [Defs.' Undisputed Facts ¶¶ 15-17;

Nurse Adcock Aff. ¶ 8 & Attachs. F, G, H, K.]  Plaintiff visited (1) an orthopedist on

July 13, 2005, who examined Plaintiff's broken finger and prescribed Ibuprofen

(equivalent to Motrin), 800 mg twice daily, and (2) a second doctor on July 15, 2005,

who examined Plaintiff's ear and prescribed Cortisporin, which was added to the

protocol of drugs Plaintiff received until his transfer to state prison (which protocol

also included Motrin, Biaxin, Silva dressings, "and Trazodone and Lexapro to treat

Plaintiff's psychiatric illness").  [Defs.' Undisputed Facts ¶¶ 18-20; Nurse Adcock

Aff. ¶ 9 & Attachs. I-K.]

Nurse Adcock and Col. Adcock each denies setting policy or making decisions

regarding the "types of prescription medications to provide or not to provide for

inmates" at the Jail.  Rather, pursuant to Jail policy, staff physicians make those

decisions.  [Defs.' Undisputed Facts ¶ 25; Col. Adcock Aff. ¶ 8; Nurse Adcock Aff.

¶ 10.]  Jail policy allows for inmates to receive controlled substances "if the in-house

doctor makes the decision they should be provided."  [Defs.' Supp. Br. at 6; Nurse

27

Adcock Aff., Attach. B.]  Nurse Adcock notes that Plaintiff never requested a change in his pain medication while at the Jail.  Moreover, she does not recall that he ever indicated that "pain control was an issue."  [Nurse Adcock Aff. ¶ 9.]

### 2.    Plaintiff's response

Plaintiff asserts that he was not prescribed any medication stronger than Motrin or Ibuprofen because, pursuant to a Jail policy enforced by Col. Adcock and his wife, Nurse Adcock (who Plaintiff claims "functions . . . as jail medical director"), "Coweta County Jail medical staff do not administer 'controlled substances' under any circumstances, and their part-time jail physician, Dr. Burnett, has been instructed not to prescribe them."  Moreover, the community physicians who examined Plaintiff after he was assaulted understood this policy "and did not bother to write a 'worthless' prescription for narcotics."  [Pf.'s Dispute ¶¶ 17-19, 25-26; see Pf.'s Resp. at 6-9.]

Plaintiff claims that Nurse Adcock substituted her own plan of treatment, including "cursory pain medication," for the E.R. physician's plan, which included Vicodin to control Plaintiff's pain after his injuries, and then signed a doctor's name on the medical report even though no doctor had examined him or approved the change in his pain medication.  [Pf.'s Resp. at 6.]  Plaintiff notes that GDOC doctors

28

prescribed narcotic pain medication for Plaintiff two weeks later, after his transfer to state prison.   Plaintiff asserts that he exhausted his "available" administrative remedies with respect to the denial of Vicodin and the alleged failure of Nurse Adcock to treat his cysts.  [Id. at 7; see Pf.'s Ex. E43 (July 14, 2005, letter to Col. Adcock requesting his prescribed Vicodin), Ex. E47 (June 2, 2005, Request for Medical Services for "knot in bottom of left foot"), Ex. E49 (July 11, 2005, Request for Medical Services for two cysts "causing pain," location not specified).]

**D.   Plaintiff's proximity to inmate Hardy at the time of the assault**

**1.   Defendants' recitation of the facts**

Sgt. Homer denies having assigned Plaintiff to "maximum security" dormitory A-6; admits that she denied Plaintiff's request to be moved from A-6, but notes that "almost all the inmates in A-6 ask to be moved"; does not recall Plaintiff "pleading to be moved" due to his fear of Hardy; and denies that she was aware of "a substantial risk to [Plaintiff's] safety from Hardy."  [Defs.' Undisputed Facts ¶ 14; Doc. 63, Aff. of Sgt. Elizabeth Homer (hereinafter Homer Aff.) ¶¶ 4-5.]  According to Defendants, Plaintiff had a history of aggressive behavior that warranted his being assigned to a maximum security dormitory.  [Homer Aff. ¶ 8; Defs.' Supp. Br. at 6-7 n.1.]

Sgt. Homer documented an incident on July 2, 2005, when Plaintiff and a fellow inmate, Demetric Roberts, "act[ed] in a threatening manner toward each other." The next day, Roberts resisted being locked down as punishment for his behavior, and Sgt. Homer moved him from A-6 to A-1 dormitory, another maximum security "pod." [Homer Aff. ¶ 5.] However, there was no basis for segregating Hardy at the time he assaulted Plaintiff. [Id. ¶ 6.] Sgt. Homer realized that Roberts and Hardy were "close" [Pf.'s Ex. E33], and she "was aware [they] could cause problems in the pod, but [she] felt moving Roberts would alleviate these problems" [Homer Aff. ¶ 5].

Although Sgt. Homer was not present at the Jail on July 12, 2005, her "understanding" is that Hardy assaulted Plaintiff during the time scheduled for cleanup of the dayroom, when all inmate cells are opened pursuant to Jail policy because all inmates are required to participate. Apparently, Hardy used a broom meant for cleanup to assault Plaintiff. Jail staff intervened as soon as practicable to prevent further violence. Sgt. Homer states that inmate violence is unusual during cleanup "because there are a lot of witnesses," and notes that Hardy was prosecuted for the assault. [Id. ¶¶ 7, 9.]

30

Nurse Webb denies that she was in A-Pod on or around July 12, 2005; denies telling Plaintiff that officers informed her there was going to be a fight between Plaintiff and Hardy; and denies she heard officers say they anticipated a fight, as Plaintiff alleges in his complaint. [Doc. 63, Aff. of Susan Webb (hereinafter Webb. Aff.) ¶ 4.] Nurse Webb states that Plaintiff told her "more than once he was going to sue staff members." Also, one day during "med call," after being denied his medication because he was late, Plaintiff announced that he was "going to sue everybody out here." [Id. ¶ 5.]

### 2.   **Plaintiff's response**

Plaintiff states that he "was attacked by a known, violent predator" and "gang member," Jason Hardy, after Sgt. Homer and Col. Adcock ignored "multiple pleas, letters, and pleas from family and a friend for [Plaintiff] to be moved to safety." [Pf.'s Dispute ¶¶ 11, 23-24.] Plaintiff contends that Sgt. Homer knew of the racial unrest between Plaintiff and the two gang members, Hardy and Roberts, "in that she had been summoned to A6 dorm by Plaintiff in a desperate attempt to escape harm," and "any reasonable person" in her position "would have realized the danger" to Plaintiff, based on "casual observation," Hardy's pattern of violent behavior, and the pleas for help from Plaintiff and his family members. [Id. ¶¶ 12-14.] Plaintiff claims

31

that he "put officials on notice through other means, in the absence of grievance forms," although he was able finally to submit a grievance on July 4, 2005, shortly before the assault occurred.  [Id. ¶¶ 22-23.]

Plaintiff asserts that he was mis-classified as a medium security inmate based on misrepresentations of his past record, and then transferred to a maximum security dormitory "due to no infraction of his own," for which transfer Defendants have given "different excuses."  [Pf.'s Resp. at 9-10.]  Plaintiff notes that Sgt. Homer did not transfer Roberts from A-6 dormitory in response to Plaintiff's "desperate demands," but did so only when Roberts threatened another officer at the Jail. Plaintiff claims that all Jail personnel knew that Hardy and Roberts were "close" and that Hardy posed a serious threat to Plaintiff and other A-6 inmates.  [Id. at 9, 10-11.]

Moreover, Plaintiff insists that Nurse Webb "did in fact tell [him] in the aftermath of the attack . . . that she could see inside the A6 dorm that trouble was brewing and that the officers told her there was going to be a fight."  Plaintiff asserts that Nurse Webb's subsequent denial of this statement, via affidavit, "does not make [his own] sworn testimony any less true."  Finally, Plaintiff denies Nurse Webb's assertion that he "announced during med call that he was going to sue everyone in the jail."  [Id. at 11.]

32

## IV.  ISSUES RAISED ON SUMMARY JUDGMENT

**A.**    **Exhaustion of administrative remedies**

**1.**    **The legal framework**

Pursuant to the Prison Litigation Reform Act of 1995 ( PLRA), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Johnson v. Meadows, 418 F.3d 1152, 1155 (11th Cir. 2005) (internal quotations omitted).  Furthermore, there is no longer a futility exception.  See Alexander v. Hawk, 159 F.3d 1321, 1325 (11th Cir. 1998) (stating that "the judicially recognized futility and inadequacy exceptions do not survive the new mandatory exhaustion requirement of the PLRA," and "there is no longer discretion to waive the exhaustion requirement").  Although "[s]ome courts have said that administrative remedies are not 'available' to an inmate if prison officials do not respond to grievances or if they prevent the filing of grievances," the Eleventh Circuit, apparently, has yet to rule on this issue.  Bryant v. Rich, Case Nos.

33

06-11116 & 06-12290, 2007 U.S. App. LEXIS 12781, at *7 n.3 (11th Cir. May 31, 2007) (unpublished opinion) (declining to address the issue and citing, *inter alia*, Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) (stating that "a remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a)")).

### 2.    **The parties' dispute**

"Defendants are unaware of Plaintiff using the grievance process [at the Jail] or even verbally complaining to them as to any of the stated claims" herein, and argue, therefore, that his complaint must be dismissed.  [Defs.' Supp. Br. at 10.] Defendants state that the Jail's "grievance policy detailed by Lt. Thompson shows all [P]laintiff had to do was give his grievance to a sergeant to start the process," but he "does not show" that he did so.  [Doc. 43, Brief in Reply to Pf.'s Resp. (hereinafter Defs.' Reply Br.) at 9.]

Plaintiff responds that he "was denied grievance forms throughout his incarceration from January 23, 2005, through July 19, 2005."  Therefore, with the grievance procedure unavailable, he solicited the aid of third parties and wrote letters to Col. Adcock and to the Coweta County Sheriff, Mike Yeager, asking to be transferred from maximum security, and placing Col. Adcock "on notice of the denial

34

of medication, denial of grievance forms, and [im]minent danger posed to Plaintiff by Roberts and Hardy."[7]  [Pf.'s Resp. at 12-13.]  Plaintiff states that Lt. Thompson has no first-hand knowledge of Plaintiff's frustrated attempts to file grievances while at the Jail.  [Id. at 13.]  He argues that his inability to obtain forms to grieve the denial of Xanax made the administrative remedy unavailable with respect to his denial-of-Xanax claim, and his numerous attempts to alert Jail officials to the danger posed by Hardy, all submitted before Hardy assaulted him, satisfied the exhaustion requirement with respect to his failure-to-protect claim.  [Id. at 12-14.]  Plaintiff also argues that his transfer to state prison shortly after the assault aborted the grievance process at the Jail, at least with respect to his remaining claims.  [Doc. 45, Rebuttal of Defs.'

---

[7]  Specifically, Plaintiff alleges that he took the following actions: (1) with respect to his failure-to-protect claim, he (a) sent a letter to Col. Adcock on July 3, 2005 [Pf.'s Aff. ¶ 47; Pf.'s Ex. E34]; (b) submitted a GDOC grievance form on July 4, 2005 [Pf.'s Dispute ¶ 22; see Pf.'s Aff. ¶ 48 & Doc. 45 at 13 (explaining that he delivered his July 3 letter and July 4 grievance by sliding them under the A-6 door as instructed by guards, a "common practice" at the Jail)]; and (c) solicited others to alert Jail officials to his plight [Pf.'s Dispute ¶ 23]; (2) with respect to his denial-of-Xanax claim, he repeatedly requested a grievance form and, after those requests were denied, he wrote a letter to Col. Adcock on February 7, 2005 [Pf.'s Aff. ¶ 24; Pf.'s Ex. E25]; (3) with respect to his denial-of-Vicodin claim, he wrote a letter to Col. Adcock on July 14, 2005 [Pf.'s Aff. ¶ 70; Pf.'s Ex. E43]; and (4) with respect to his claim that he was denied treatment for his cysts, he submitted a Request for Medical Services on June 2, 2005, and another Request on July 11, 2005 [Pf.'s Resp. at 7; Pf.'s Exs. E47, E49].

35

Reply Br. at 13.][8]  In sum, Plaintiff argues that the exhaustion requirement "was never intended as a shield for constitutional violations" and should not serve as the basis for dismissing his complaint now.  [Pf.'s Resp. at 14-15.]

**3.     Analysis**

Except for the GDOC grievance form that Plaintiff alleges he submitted on July 4, 2005, it is undisputed that he did not submit an inmate grievance form to an officer at the Jail at any time during the relevant period of his incarceration there in 2005, prior to his transfer to state prison on or about July 19, 2005.  Normally, that would end the matter, and the instant complaint would be dismissed pursuant to 42 U.S.C. § 1997e(a) for Plaintiff's failure to exhaust his administrative remedies.  However, as set forth *supra*, Plaintiff contends that he was repeatedly denied Coweta County Jail grievance forms during the time period at issue, and he has detailed the various efforts he made to alert Jail officials to his grievances, despite those repeated denials. Accordingly, there appears to be a genuine issue of material fact as to whether, before filing the instant lawsuit, Plaintiff did indeed exhaust, with respect to at least three of

---

[8]  Although N.D. Ga. Local Rule 56.1.A. prohibits "supplemental briefs and materials, with the exception of a reply by the movant, except upon order of the court," the Court will consider Plaintiff's Rebuttal to the extent that it facilitates a resolution of the summary judgment issues herein.

36

his four claims, "such administrative remedies as are available," which is all that §

1997e(a) requires.  It would be an anomalous result, indeed, if prison officials could

foreclose prison inmates from filing civil rights lawsuits in federal court simply by

depriving them of the means to fulfill a mandatory prerequisite to doing so.

Even so, by Plaintiff's own account, the only attempt he made to exhaust his

administrative remedies with respect to the alleged denial of care for his cysts was by

filing two requests for medical services.  [See, e.g., Pf.'s Resp. at 7.]  However, this

Court will not treat Plaintiff's requests for treatment of his cysts as attempts by him

to grieve the alleged denial of that treatment.  [Compare Pf.'s Ex. E47 (Request for

Medical Services) with Thompson Aff., Attach. B (Inmate Grievance Form,

submitted by Plaintiff to Jail authorities on October 24, 2005, on unrelated matter).]

Accordingly, because Plaintiff has not asserted that he made any other attempt to

grieve the alleged denial of medical care for his cysts, even after his transfer to state

prison, his claim in this regard will be dismissed without prejudice due to his failure

to exhaust the available administrative remedies.  At a minimum, Plaintiff might have

attempted to pursue those remedies after his transfer through the use of the United

States mail.  See Bryant, 2007 U.S. App. LEXIS 12781, at *7-*8 & n.3 (concluding

that it was unnecessary to decide whether administrative remedies were unavailable

to prisoner prior to his transfer from one state prison to another because it was undisputed that such remedies were available after his transfer).

**B.    Lack of physical injury due to denial of Xanax**

### 1.    The legal framework

As discussed in greater detail in Section IV.D.1., *infra*, the Eighth Amendment prohibits cruel and unusual punishment, including deliberate indifference to a serious medical need amounting to the unnecessary and wanton infliction of pain.  See Steele v. Shah, 87 F.3d 1266, 1269 (11th Cir. 1996) (stating that "[i]n this circuit, it is established that psychiatric needs can constitute serious medical needs and that the quality of psychiatric care one receives can be so substantial a deviation from accepted standards as to evidence deliberate indifference to those serious psychiatric needs.").  Nevertheless, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  "In order to avoid dismissal under § 1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than de minimis."  Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1312-13 (11th Cir. 2002).

38

The meaning of the phrase "greater than de minimis," however, is far from clear.  At least one district court in this Circuit has held that "diarrhea, vomiting, cramps, nausea, and head aches from eating spoiled food " are *de minimis* injuries, precluding the recovery of compensatory damages.  Watkins v. Trinity Serv. Group Inc., Case No. 8:05-cv-1142, 2006 U.S. Dist. LEXIS 85592, at *10-*11 (M.D. Fla. Nov. 27, 2006).  See also Daniels v. Beasley, Case No. 07-20015, 2007 U.S. App. LEXIS 18137, at *1-*2 (5th Cir. July 30, 2007) (unpublished opinion) (concluding that claim failed based on prisoner's receipt of "wrong medication, which resulted in excessive sleep, a loss of appetite, and a temporary loss of vision," because, *inter alia,* prisoner failed to show that "his injuries were more than de minimis" under § 1997e(e)); Sneed v. Hunt County Med. Dep't, Case No. 3-05-CV-2032, 2006 U.S. Dist. LEXIS 3479, at *7 (N.D. Tex. Jan. 31, 2006) (holding that prisoner's allegations, "that he suffered 'discomfort to mental health, lack of sleep, [and] anxiety attack[s]' as a result of not receiving his medication," were "insufficient to establish 'physical injury' under the PLRA").  But see, e.g., Munn v. Toney, 433 F.3d 1087, 1089 (8th Cir. 2006) (holding that plaintiff's allegations of "headaches, cramps, nosebleeds, and dizziness," as a result of being denied his prescribed blood-pressure treatment, survived § 1997e(e) review).

39

It appears that § 1997e(e), when applicable, bars the recovery of compensatory damages, but the availability of punitive and/or nominal damages in certain cases is still an open question in this Circuit.  See Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003) (concluding that "[n]ominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages," but remanding to district court to determine whether prisoner complaint "could be liberally construed to request nominal damages").  See also Boxer X v. Donald, 169 Fed. Appx. 555, 558-59 & n.1 (11th Cir. 2006) (unpublished opinion) (noting that Eleventh Circuit has yet to decide whether, absent a showing of physical injury as required by § 1997e(e), nominal or punitive damages are unavailable).

## 2.    The parties' dispute

Defendants argue that Plaintiff's claims that "he was anxious, experienced nausea and vivid nightmares and had fluctuating blood pressure and hallucinations" are insufficient to satisfy the § 1997e(e) physical injury requirement.  [Defs.' Reply Br. at 10.  See also Defs.' Supp. Br. at 10-11.]  Plaintiff responds that "he was on a mental 'roller coaster ride' due to Coweta County's repeatedly 'crashing him, cold

turkey' from extended periods of heavy prescription use of Xanax,"[9] which "unnecessary mental abuse was the main contributor to his suicide attempt on or about January 23, 2005." [Pl.'s Resp. at 16.]  Plaintiff states that "this near death experience was in fact a physical injury."  After a three-day recovery period at a hospital psychiatric unit, Plaintiff returned to the Jail, where he was once again "crashed" off his prescribed medication, "endangering him of seizure and coma," and causing him "mental torment."  Plaintiff contends that his mental suffering was so severe that it amounted to "serious physical harm."  He also claims that, even without physical injury, he is entitled to punitive damages for this serious harm.  [Id. at 16-18.]

### 3.    **Analysis**

In his amended complaint, Plaintiff claims that "he suffered from illusions in a reduced mental state" and was "near a nervous breakdown" as the result of the denial of Xanax in January 2005.  [Doc. 8, ¶ IV & Part IV attached page 1.]  In his affidavit, Plaintiff asserts that he experienced "5 days in mental agony," from January 26, 2005, until on or about January 31, 2005, consisting of "agonizing anxiety,

---

[9]  Once again, Plaintiff refers to his prior incarcerations at the Jail, in August and November 2004, which are not at issue herein.

nausea, vivid nightmares, fluctuating blood pressure, and audio and visual hallucinations." [Pf.'s Aff. ¶¶ 22-24; see Pf.'s Exs. E22-E24.]  However, one of Plaintiff's own exhibits refutes his claim that his "fluctuating blood pressure" constituted a physical injury. [See Pf.'s Ex. E22 (indicating that from January 28, 2005, through January 30, 2005, Plaintiff's six systolic blood pressure readings (two per day) ranged from a low of 116 to a high of 130, with an average reading of 123, and his diastolic readings ranged from a low of 80 to a high of 90, with an average reading of 85).]

Plaintiff's remaining symptoms – anxiety, nightmares, and hallucinations – do not rise to the level of a physical injury that is "greater than de minimis." Moreover, although Plaintiff did seek treatment for his "cold symptoms" during the five-day period at issue, he apparently did not complain of nausea or any other physical symptom as a result of Xanax withdrawal, stating only that he felt "agitated." [See Nurse Adcock Aff. ¶ 4 & Attach. A.] Accordingly, pursuant to 42 U.S.C. § 1997e(e), Plaintiff may not obtain compensatory damages based on his denial-of-Xanax claim.[10]

---

[10]   However, Plaintiff might have been able to obtain punitive or nominal damages on his denial-of-Xanax claim if this claim otherwise were to survive summary judgment review, which, as discussed in Section IV.D.1.b.(1), *infra*, it does not.

**C.**     **Col. Blake's supervisory liability**

**1.**     **The legal framework**

Noting the well-established rule "that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability," the Eleventh Circuit has stated that, instead, a supervisor is individually liable only when he "personally participates in the alleged unconstitutional conduct or when there is a causal connection between [his] actions . . . and the alleged constitutional deprivation." <u>Cottone v. Jenne</u>, 326 F.3d 1352, 1360 (11th Cir. 2003).  This causal connection can be established by showing that the supervisor knew about and failed to correct a widespread history of abuse or had a custom or policy that resulted in a constitutional violation, or that the "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." <u>Id.</u> (Internal quotations omitted).  "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." <u>Id.</u>

43

### 2.    The parties' dispute

Col. Adcock asserts that he cannot be held liable for the violations alleged by Plaintiff because he played no role in setting the Jail's policy regarding medications, and he did not deny Plaintiff medications or a transfer out of maximum security detention.  [Defs.' Supp. Br. at 11-12.]

Plaintiff responds that Col. Adcock, the administrator of a small jail, who, according to Sheriff Yeager, "does indeed run the jail," cannot deny all responsibility for Plaintiff's mis-classification as a maximum security prisoner and for the enforcement of the Jail's "no controlled substances" policy.  [Pf.'s Resp. at 18.] Plaintiff asserts that Col. Adcock refused Cpl. Morgan's and Sgt. Homer's separate inquiries as to whether Plaintiff might be removed from dormitory A-6; ignored the three letters Plaintiff sent to him regarding Plaintiff's treatment at the Jail; and acted as the final decisionmaker with respect to Plaintiff's housing, as evidenced by Sgt. Homer's comments that "she was not moving anybody" and that "she wasn't calling Col. Adcock at home on a weekend."  [Id. at 19-20.]

### 3.    Analysis

Although Col. Adcock may not be held liable in his individual capacity simply because he "runs the jail," as Plaintiff suggests, he may be held liable if he knew

about or was personally involved in any decision that violated Plaintiff's constitutional rights, or if he enforced a custom or policy that resulted in a violation. See Cottone, 326 F.3d at 1360. Based on these standards, Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether Col. Adcock may be held liable in his individual capacity. [See, e.g., Pl.'s Ex. E25 at 1 (Plaintiff's February 7, 2005, letter to Col. Adcock, wherein Plaintiff states he "was told by all [medical personnel at the Jail] that Zanex [sic] is not allowed in this jail by orders of Nurse Jennie Adcock and yourself").][11] At a minimum, there is a genuine issue as to whether Col. Adcock enforced a "controlled substances" policy that, by longstanding practice, resulted in deliberate indifference to one or more of Plaintiff's serious medical needs.

Moreover, a county official may be held liable in his official capacity if a constitutional violation resulted from (1) "an action taken or policy made" by a final policymaker for the county in the "area of [its] business" at issue, or (2) "a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir.

---

[11] Although Defendants characterize such statements as hearsay [see Defs.' Reply at 4], these statements, and others like them, may be admissible under Fed. R. Evid. 801(d)(2)(D) as admissions of a party-opponent. See Sect. II, *supra*.

45

1995).  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55, 694 (1978)

(noting that "official-capacity suits generally represent only another way of pleading

an action against an entity of which an officer is an agent," and stating that a local

government may be held liable under § 1983 "when execution of [its] policy or

custom, whether made by its lawmakers or by those whose edicts or acts may fairly

be said to represent official policy, inflicts the injury"); Grech v. Clayton County, 335

F.3d 1326, 1329-30 & nn.5-6 (11th Cir. 2003) (en banc) (discussing official-capacity

liability of county officials).  See also Purcell v. Toombs County, 400 F.3d 1313,

1325 & n.27 (11th 2005) (concluding that "Georgia . . . sheriff's authority and duty

to administer [his] jail . . . flows from the State, not [the] County" – entitling him to

Eleventh Amendment immunity from suit for damages in his official capacity, but

failing to reach same issue with respect to jail administrator because district court did

not address it and appellant did not raise it); Sanders v. Langley, Case No.

1:03-cv-1631-WSD, 2006 U.S. Dist. LEXIS 21180, at *29-*32 (N.D. Ga. Mar. 29,

2006) (Duffey, J.) (denying Eleventh Amendment immunity to Georgia sheriff on

prisoner's claims of deliberate indifference to his serious medical needs).

Accordingly, Col. Adcock is not insulated from liability herein, either in his

individual or official capacity, based on his position as a supervisor at the Jail.

46

However, punitive damages are unavailable in a suit against a county and, hence, in a suit against a county employee in his or her official capacity.  See, e.g., Alexander v. Fulton County, 207 F.3d 1303, 1322 n.14 (11th Cir. 2000), overruled on other grounds, Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003) (en banc).  See also Newport v. Fact Concerts, 453 U.S. 247, 271 (1981) (stating that "a municipality is immune from punitive damages under 42 U.S.C. § 1983").

**D.      The elements of a constitutional violation**

To prevail on a claim for relief under 42 U.S.C. § 1983, a plaintiff must establish that an act or omission committed by a person acting under color of state law deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States.  See Hale, 50 F.3d at 1582.

**1.      Deliberate indifference to a serious medical need**

**a.      The legal framework**

The Eighth Amendment prohibits indifference to a serious medical need so deliberate that it "constitutes the unnecessary and wanton infliction of pain."  Estelle v. Gamble, 429 U.S. 97, 104 (1976) (internal quotations omitted).  To demonstrate deliberate indifference, a plaintiff must show both "an objectively serious medical need" and the defendant's subjective knowledge of, and more than negligent

47

disregard of, that need.  Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003).  See

also Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)

(noting that "a 'serious' medical need is one that has been diagnosed by a physician

as mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention").  "A core principle of Eighth

Amendment jurisprudence in the area of medical care is that prison officials with

knowledge of the need for care may not, by failing to provide care, delaying care, or

providing grossly inadequate care, cause a prisoner to needlessly suffer the pain

resulting from his or her illness."  McElligott v. Foley, 182 F.3d 1248, 1257 (11th

Cir. 1999) (noting that "prison officials may violate the Eighth Amendment's

commands by failing to treat an inmate's pain").

Negligence, however, even rising to the level of medical malpractice, does not

constitute deliberate indifference.  McElligott, 182 F.3d at 1254.  See also Hinson v.

Edmond, 192 F.3d 1342, 1345 (11th Cir. 1999) (noting that it is well-settled that

"medical malpractice–negligence by a physician–is insufficient to form the basis of

a claim for deliberate indifference"), amended by 205 F.3d 1264 (2000); Adams v.

Poag, 61 F.3d 1537, 1543 (11th Cir. 1995) (noting that "[m]ere negligence in

diagnosing or treating a medical condition is an insufficient basis" for a deliberate

48

indifference claim).  Nor does a simple disagreement over a diagnosis or course of treatment constitute deliberate indifference.  As long as the medical treatment provided is "minimally adequate," a prisoner's preference for a different treatment does not give rise to a constitutional claim.  See Harris v. Thigpen, 941 F.2d 1495, 1504-05 (11th Cir. 1991); see also Adams, 61 F.3d at 1547 (concluding that the medical provider's "failure to administer stronger medication" to a prisoner who subsequently died was "a medical judgment and, therefore, an inappropriate basis for imposing liability under section 1983").

### b. The parties' dispute

Defendants argue that there is no causal connection between their actions and Plaintiff's alleged injuries because staff doctors, not Col. Adcock or Nurse Adcock, made the decisions regarding Plaintiff's medications.  [Defs.' Supp. Br. at 13-14.] They also argue that Plaintiff's claims amount to no more than a disagreement over the course of treatment he received, and that "Plaintiff's need for Xanax for anxiety and more attention to his cyst were not sufficiently serious medical needs to make the refusal a constitutional violation." [Id. at 14-15.] Defendants argue further that their actions did not constitute deliberate indifference because, on each occasion when Plaintiff did not receive his prescribed medications, "he was given other

49

medications."  Finally, they contend that substituting Motrin for Vicodin does not give rise to an Eighth Amendment violation.  [Id. at 17.]

Noting that no staff doctor has submitted an affidavit in support of Defendants' motion for summary judgment, Plaintiff argues that Nurse Adcock's "very cursory substitution" of Motrin for Vicodin – without having Plaintiff examined by a doctor – is constitutionally infirm, as demonstrated by the prescription of stronger pain medication by GDOC doctors just two weeks later.  [Pl.'s Resp. at 21-22.]  Plaintiff also claims that the emotional distress he suffered as a result of repeated denials of Xanax and the injuries he suffered in inmate Hardy's assault are sufficient to show a causal connection between his injuries and Defendants' actions and omissions.  [Id. at 22-23.]  Finally, Plaintiff asserts that the "twice denial of [his] Xanax and the resulting mental 'roller coaster ride' that subsequently resulted in a suicide attempt and unnecessary mental torture"; the substitution of the ineffective Motrin for the prescribed Vicodin when he was in severe pain after Hardy's assault; and the total lack of treatment for his cysts before July 12, 2005, demonstrate deliberate indifference to his serious medical needs.  [Id. at 23-27.]

50

c.     **Analysis**

(1)     **Denial of Xanax**

When Plaintiff arrived at the Jail on or about January 26, 2005, he had a prescription for three medications to address his mental condition – Lexapro (10 mg daily), Trazodone (50 mg daily), and Xanax (1.5 mg daily).  [Pf.'s Ex. E18.]  Jail officials discontinued the Xanax, without substituting "other medications," as they claim, and without attempting to wean Plaintiff from the Xanax by gradually reducing his dosage.  See Burdette v. Butte County, 121 Fed. Appx. 701, 702 (9th Cir. 2005) (unpublished opinion) (concluding that prisoner, who had suffered seizure and fall while awaiting pill call, had failed to show that decision "to taper him off of Xanax and prescribe Imipramine" constituted deliberate indifference to a serious medical need because "[i]t is undisputed that the risk of serious side effects from tapering a patient off of Xanax is statistically slight").

Even so, the gravamen of Plaintiff's claim that he had a serious medical need for Xanax is based on his alleged suffering during the approximately five days when he was on suicide watch at the Jail, from January 26 until January 31, 2005.  [See Pf.'s Aff. ¶¶ 22-24.]  However, Plaintiff does not assert that he informed Defendants of the alleged seriousness of his mental condition during that critical five-day period,

51

and the medical records reflect that he did not, instead complaining only of "cold symptoms." [See Nurse Adcock Aff. ¶ 4 & Attach. A.]

Given that Plaintiff was receiving other "psychotropic medication" during that time period, this Court cannot conclude that the record before it sets forth a genuine issue of material fact as to whether Defendants were *deliberately indifferent* to a serious medical need resulting from the denial of Xanax to Plaintiff. It appears to the Court that, at most, Plaintiff's denial-of-Xanax claim amounts to a claim of medical negligence, which cannot form the basis for an Eighth Amendment claim of cruel and unusual punishment. Although, in *Steele*, the Eleventh Circuit reversed the district court's grant of summary judgment to a doctor who had denied a patient his prescribed psychotropic medication, it did so in light of evidence that the prescribing medical team had informed the defendant-doctor that his patient was a "potential suicide risk" without the medication. See Steele, 87 F.3d at 1268-71.

Here, by contrast, there is no indication in the record that any outside physician, or that Plaintiff himself, for that matter, informed the Jail medical staff that Plaintiff was a potential suicide risk or otherwise had a serious medical need for Xanax during the time period at issue. In fact, Plaintiff states that the physician at the psychiatric unit who treated him prior to his transfer to the Jail determined that he

52

was "non-suicidal" upon his release from the unit on January 26, 2005. [Pf.'s Aff. ¶ 23.] Moreover, the Jail's Medical Notes for the weeks following Plaintiff's release from suicide watch – made by, among others, Dr. Scott, apparently the staff psychiatrist – indicate that, on February 1, 2005, Plaintiff was "no longer suicidal"; on February 2 and February 16, 2005, he was "not depressed"; and on February 14, 2005, although he claimed that he was "hearing voices" and "not sleeping," he slept "during the day" and did not appear "psychotic." [Pf.'s Exs. E20, E23, E24.] Nowhere in the above Medical Notes, or in any other record evidence, does it appear that Plaintiff complained of "extreme" or "agonizing" anxiety, "horribly torturous nightmares," or any other profound mental disturbance as a result of being denied Xanax, as he has asserted in various pleadings herein. [See Doc. 8; Pf.'s Aff. ¶ 23.] Accordingly, without record evidence that Defendants were aware that Plaintiff had a serious medical need for Xanax, there is no genuine issue of material fact as to whether Defendants' denial of Xanax constituted deliberate indifference. Defendants are entitled to summary judgment on Plaintiff's denial-of-Xanax claim.

### (2)    Treatment of Plaintiff's cysts

It is unclear from the record when, if ever, Plaintiff's cysts became a serious medical need to which Defendants might have been deliberately indifferent. See

53

Clark v. Argutto, 221 Fed. Appx. 819, 823, 824 (11th Cir. 2007) (unpublished opinion) ("assuming arguendo that the cyst [on prisoner's wrist] was an objectively serious medical need," but affirming summary judgment to defendants because prisoner "received an MRI and has not shown deliberate indifference to a serious medical need"). However, this Court need not address the merits of Plaintiff's claim in this regard because there is not a genuine issue of material fact as to whether Plaintiff attempted to exhaust his administrative remedies with respect to this claim. See Section IV.A.3., *supra*. Accordingly, the instant claim will be denied without prejudice.

### (3)    **Denial of Vicodin**

It is undisputed that Plaintiff returned from the hospital in July 2005 with a prescription for Vicodin, for which Nurse Adcock substituted Motrin. Although Nurse Adcock states that Dr. Burnett approved the substitution, her notes of July 13, 2005, do not make this clear. [See Nurse Adcock Aff. ¶ 8 & Attach. H.] Moreover, Defendants do not attempt to show that Motrin provides pain relief equivalent to that provided by Vicodin. In that regard, their citation of a Tenth Circuit case – holding that the substitution of Tylenol for dentist-prescribed Motrin passed constitutional muster – is unpersuasive. [See Defs.' Supp. Br. at 17.] Furthermore, in reversing a

54

district court's grant of summary judgment to a doctor and nurse who had prescribed ineffective medications for a prisoner's severe pain (who "basically did nothing to alleviate that pain"), the Eleventh Circuit held that it was a jury question whether the defendants had been deliberately indifferent to the prisoner's serious medical needs. McElligott, 182 F.3d at 1257-58 (citing with approval Third Circuit opinion "finding that inmate stated a claim for deliberate indifference based on denial of post-operative pain medication," and noting that, "although plaintiff was provided with aspirin, this may not constitute adequate medical care") (internal quotations omitted).  As noted *supra*, "deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment."  Seals v. Shah, 145 F. Supp. 2d 1378, 1384 (N.D. Ga. 2001) (Thrash, J.).

Nevertheless, it is undisputed that neither of the two community physicians who examined Plaintiff in July 2005, shortly after his return to the Jail from the hospital emergency room, prescribed anything stronger than Motrin.  [Nurse Adcock Aff. ¶ 9 & Attachs. I, J.]  Plaintiff's assertion that these doctors adapted their medical recommendations to the Jail's policy on controlled substances is entirely speculative and unsupported by actual evidence.  Moreover, the Emergency Room Note for Plaintiff's July 12, 2005, hospital visit immediately after his altercation with Hardy

55

indicates that Plaintiff was "in *mild* distress" and only "complain[ed] of *some pain* to the left wrist and back of the hand where he was struck with a broom handle." [Pf.'s Ex. E38 at 1 (emphasis added).]  Accordingly, the Court finds that, at most, Plaintiff's denial-of-Vicodin claim amounts to a disagreement over a course of treatment recommended by different medical doctors, none of whom is a defendant herein.  The Court concludes that there is no genuine issue of material fact as to whether this claim sets forth an Eighth Amendment violation, which it does not.  See, e.g., Harris, 941 F.2d at 1504-05.  Therefore, Defendants are entitled to summary judgment on Plaintiff's denial-of-Vicodin claim.

### 2.   Failure to protect Plaintiff from assault by inmate Hardy

#### a.   The legal framework

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994).  However, not every instance of inmate on inmate violence "translates into a constitutional liability for prison officials responsible for the victim's safety." Id. at 834.  A violation occurs "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." Marsh v. Butler County, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc) (internal

56

quotations omitted).  To survive summary judgment, a Plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation."  <u>Hale</u>, 50 F.3d at 1582. "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983 . . . . The known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate indifference." <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotations omitted).  Moreover, to be deliberately indifferent, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." <u>Farmer</u>, 511 U.S. at 837 (emphasis added).

### b.   **The parties' dispute**

Defendants argue that Sgt. Homer was unaware of a substantial risk to Plaintiff from inmate Hardy prior to their fight, and she was not on duty at the time of the fight, so that she cannot be held liable for the injuries that Hardy inflicted upon Plaintiff.  [Defs.' Supp. Br. at 13.]  Defendants contend that "general hostilities" in a prison dormitory do not constitute a substantial risk of harm.  [Defs.' Reply at 14.] They assert that by removing inmate Roberts from dormitory A-6, Sgt. Homer took

57

the action she felt necessary to prevent violence between Roberts and Plaintiff, without realizing that Hardy's friendship with Roberts gave cause to be concerned about Plaintiff's welfare.  Defendants argue that although, in hindsight, Sgt. Homer "could have taken a different course of action, the Constitution does not provide a forum for second-guessing."  [Defs.' Supp. Br. at 18-20.]

Plaintiff responds by asserting that he suffered escalating abuse from Roberts and Hardy from the time Roberts was assigned to dormitory A-6; that Sgt. Homer was aware of the "strong connection" between these two "gangstas"; and that, given the repeated warnings from Plaintiff and others, neither Sgt. Homer nor Col. Adcock could have been unaware of the danger that Hardy posed to Plaintiff.  [Pf.'s Resp. at 28-30; see Pf.'s Ex. E31 (Sgt. Homer's 7-2-05 incident report, noting, "Problems w/ inmates 'dividing up.' Black vs. White."); Pf.'s Ex. E33 (Sgt. Homer's 7/03/05 incident report, referring to Roberts and Hardy as "close," and noting that "these two have the potential to cause more problems").]

Plaintiff states that a Jail officer informed him that Hardy had been transferred into dormitory A-6 after being involved in a fight with two other inmates, who "were able to get the best of him (Hardy) with a broom handle."  [Pf.'s Aff. ¶ 33.]  Shortly thereafter, Hardy assaulted two Mexicans inmates in A-6, slamming a cell door on the

58

hand of one of them and severing the last joint on one of his fingers, which Plaintiff knew because he and two other inmates had helped clean up the blood and had found the severed joint.  [Id. ¶ 37.]

According to Plaintiff, the Jail officers knew about Hardy's propensity to verbal abuse, which Hardy displayed on a regular basis, and advised Plaintiff to "steer clear" of Hardy because "he is a bad one."  [Id. ¶¶ 34-35, 38.]  Plaintiff states that Hardy's co-defendants on aggravated assault and battery charges were removed from A-6 prior to Hardy's arrival there "to protect them from Hardy."  [Id. ¶ 32.]  When Roberts was placed in A-6 in May 2005, he and Hardy "became abusive toward [Plaintiff], threatening violence and calling [him] 'cracker.'"  [Id. ¶ 36.]  By July 2, 2005, there were "near riot conditions" in A-6, with "nearly all blacks . . . now abusive" to him, and continuing threats of violence.  [Id. ¶¶ 40, 42-43.]

   c.   **Analysis**

Hardy's allegedly belligerent attitude towards whites and, in particular, Plaintiff, and his allegedly repeated acts of violence at the Jail; his friendship with Roberts, who apparently shared Hardy's feelings and who nearly came to blows with Plaintiff; Nurse Webb's alleged, though disputed, statement that guards at the Jail anticipated a fight between Hardy and Plaintiff at some time not long before the

assault; the allegedly repeated warnings to Jail officials, from Plaintiff and others, that Hardy posed a danger to Plaintiff – all these facts, alleged by Plaintiff or admitted by Defendants, suggest that Hardy's close proximity to Plaintiff constituted a risk of harm to Plaintiff. Moreover, a reasonable response to this risk would have been to separate Plaintiff from Hardy. See Hale, 50 F.3d at 1583-85 (reversing grant of summary judgment to County Sheriff because, *inter alia,* there was evidence "of several reasonable measures to reduce the risk of violence"). Nevertheless, as discussed *infra*, Plaintiff's allegations, serious though they may be, do not establish a genuine issue of material fact as to whether Sgt. Homer and/or Col. Adcock not only knew of facts suggesting that Plaintiff faced a substantial risk of serious harm from Hardy, but also subjectively drew the inference that he did. See Farmer, 511 U.S. at 837.

Carter v. Galloway, 352 F.3d 1346 (11th Cir. 2003), is instructive in this regard. In *Carter*, the plaintiff, who had suffered a knife attack at the hands of his cellmate, appealed the district court's grant of summary judgment, in favor of two prison officials, on the plaintiff's claim that the officials had been deliberately indifferent to a substantial risk of serious harm posed by his cellmate. Id. at 1347. The Eleventh Circuit affirmed the grant of summary judgment because there was

60

insufficient record evidence of the defendants' "subjective awareness" of such a risk.

Id. at 1349.

> During Plaintiff's time [with his] cellmate . . ., Defendants clearly knew that [the cellmate] was a "problem inmate" with a well-documented history of prison disobedience and had been prone to violence. Defendants also had specific notice from Plaintiff that [the cellmate] acted crazy, roaming his cell like a "caged animal." But before Defendants' awareness arises to a sufficient level of culpability, there must be much more than mere awareness of [the cellmate's] generally problematic nature.

Id.. Despite the plaintiff's many complaints to the defendants, he never directly told

them that his cellmate had threatened him, although he did inform them of his

cellmate's remark that the plaintiff would help with the cellmate's plan to fake his

own hanging "one way or another," which, apparently, the plaintiff took as a threat.

Id. at 1349-50.

> To assume that Defendants actually made the inference that [the cellmate's] statement constituted a serious threat would assume too much. Defendants would have had to read imaginatively all derogatory and argumentative statements made between prisoners to determine whether substantial risks of serious harm exist. We do not view the summary judgment record as supporting a contention that Defendants drew the inference or should have drawn the inference from [the cellmate's] "one way or another" comment as a serious threat, leaving Plaintiff exposed to any substantial risk of serious harm.

> Defendants arguably should have placed Plaintiff elsewhere but merely negligent failure to protect an inmate from attack does not justify

61

liability under section 1983. Defendants only possessed an awareness of [the cellmate's] propensity for being a problematic inmate; to find Defendants sufficiently culpable would unduly reduce awareness to a more objective standard, rather than the required subjective standard set by the Supreme Court. Such a generalized awareness of risk in these circumstances does not satisfy the subjective awareness requirement.

Id. at 1350 (footnote, citation, and internal quotations omitted). See also Lavender v. Kearney, 206 Fed. Appx. 860, 863-64 (11th Cir. 2006) (unpublished opinion) (affirming summary judgment for defendant because, although he knew of assailant's "violent nature and knew of his racial animus against white residents," "there was no evidence he was aware that [assailant] posed a specific risk" to plaintiff; and noting that "[g]eneral knowledge about an inmate's violent tendencies, without more specific information about the risk, does not constitute deliberate indifference"). McBride v. Rivers, 170 Fed. Appx. 648, 655 (11th Cir. 2006) (unpublished opinion) (affirming grant of summary judgment to defendants because, although plaintiff, a victim of inmate violence, had informed defendants "that he feared for his life" if placed in same cell with his eventual assailant, plaintiff "did not identify a specific prior incident, from which the defendant could infer that a substantial risk existed").

Likewise here, although Plaintiff asserts that Hardy threatened him repeatedly in the days before the assault, Plaintiff has not identified any specific "serious threat"

62

from Hardy, which he then reported to Sgt. Homer, Col. Adcock, or any other Jail officer prior to July 12, 2005.  See Carter, 352 F.3d at 1350 (discussing "serious threat" requirement and noting that "derogatory and argumentative statements" are not equivalent to threats).  The only specific threat that Plaintiff sets forth in the record is Hardy's alleged threat on the morning of July 12, 2005, shortly before the assault occurred, that he would "swing on" Plaintiff, by which time it was too late for Sgt. Homer, who was not on duty at the time, or Col. Adcock, who did not personally witness the threat, to do anything to help Plaintiff.  [See Pf.'s Aff. ¶ 50; see also Doc. 8-2, Part IV attach. ¶¶ 19-20 (alleging that on or about July 5, 2005, after Roberts had been transferred, Plaintiff "began receiving renewed threats" from Hardy, and that on July 12, 2005, approximately thirty minutes before the assault, Hardy threatened Plaintiff in the breakfast line, "attempted a sneak attack from behind on Plaintiff," and spit on Plaintiff "in plain view" of three officers).]

The fact that Hardy was a "problem inmate" with "violent tendencies" simply "does not satisfy the subjective awareness requirement."  See Carter, 352 F.3d at 1350; Lavender, 206 Fed. Appx. at 863.  At most, Plaintiff has demonstrated that Defendants were negligent in not separating him from Hardy, but negligence is not the constitutional standard by which Defendants' actions or omissions are to be

63

judged.  See Carter, 352 F.3d at 1350.  Sgt. Homer asserts that she felt that the

transfer of Roberts away from A-6 dormitory on July 3, 2005, "alleviated the[]

problems" there.  [Homer Aff. ¶ 5.]  There simply is insufficient evidence in the

record to allow the Court, or a jury, to second guess Sgt. Homer's assertion that she

was not aware of a substantial risk of serious harm to Plaintiff during the nine days

that intervened between the transfer of Roberts and the assault by Hardy.

Accordingly, although the Court is sympathetic with the misfortune that befell

Plaintiff as a result of that assault, Sgt. Homer and Col. Adcock are entitled to

summary judgment on Plaintiff's claim that they were deliberately indifferent to the

risk of harm posed by Hardy.

## E.     Qualified immunity

Finally, Defendants assert the defense of qualified immunity.  [Defs.' Supp. Br.

at 20-22.]  However, because, as set forth supra, there is no genuine issue of material

fact with respect to any of the constitutional violations Plaintiff has alleged herein,

the issue of Defendants' qualified immunity is moot.  See Crosby v. Paulk, 187 F.3d

1339, 1345 (11th Cir. 1999) (noting that "the failure to state a violation of federal law

resolves or moots the issue of qualified immunity").

64

## V.  CONCLUSION

For the foregoing reasons,  Defendants' Motion for Summary Judgment [Doc. 26] is **GRANTED**.  All of Plaintiff's claims are **DISMISSED WITH PREJUDICE**, except for Plaintiff's claim that he was denied medical care for his cysts, which is **DISMISSED WITHOUT PREJUDICE** due to his failure to exhaust the available administrative remedies.

Plaintiff's Motion to Compel [Doc. 47], Second Motion to Compel Discovery [Doc. 59], Second Motion for Rule 56(f) Continuance [Doc. 56], and Motion for Appointment of Counsel [Doc. 49] are **DENIED AS MOOT**.  Plaintiff's Motion for Extension of Time [Doc. 52] is **GRANTED** *nunc pro tunc*.  Plaintiff's Motion for Reconsideration [Doc. 53] is **DENIED**.

**IT IS SO ORDERED**, this  28th  day of September, 2007.

JACK T. CAMP
UNITED STATES DISTRICT JUDGE